IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| KENNETH W. KEELEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 04-1539-AA |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) | OPINION AND ORDER |
| | ) | |
| Defendant. | ) | |

TIM WILBORN
WILBORN & ASSOCIATES, P.C.
2020-C SW 8th Avenue, PMB # 294
West Linn, Oregon 97068

    Attorneys for Plaintiff

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 SW Third Avenue, Ste 600
Portland Oregon 97204

1 - OPINION AND ORDER

MICHAEL McGAUGHRAN
L. JAMALA EDWARDS
Social Security Administration
701 5th Avenue,
Suite 901 M/S 2900
Seattle Washington 98104

    Attorneys for Defendant

AIKEN, District Judge:

## INTRODUCTION

Plaintiff Kenneth Keeley brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). The Commissioner's decision is affirmed.

## BACKGROUND

Keeley was born on September 11, 1947. He completed high school and two years of college and earned a two-year degree in civil engineering technology and surveying. He worked in the past as a part owner and employee of a bottled water company where he performed accounting, bookkeeping, distribution management and cost and rate clerk tasks. The business was sold in June 1997, and Keeley agreed to work for the holding company created to wrap up the old company's business. He performed general clerical and office duties until December 1, 1999, when "there was no more work to be done with that company." Tr. 874.[1]

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 11).

Keeley alleges disability beginning December 1, 1999. He alleges inability to concentrate, low energy and strength, inability to sit or stand for long periods, drowsiness, high blood pressure, migraine headaches, neck and shoulder pain, leg pain, dry eyes, chronic fatigue, irregular sleep and medications side effects. Tr. 116.

Keeley filed his claim in January 2000. On October 16, 2001, an ALJ determined that Keeley retained the ability to perform his past work. Keeley appealed that decision to this court, which remanded for further proceedings based on a stipulation of the parties. On remand from this court, the Appeals Council remanded for resolution of one issue. The Appeals Council found the record unclear regarding the nature of Keeley's work in the period after the change in ownership of the bottled water company in June 1997. It found the vocational expert's testimony unclear regarding which of Keeley's former tasks she believed to be within his present capabilities. Accordingly, the Appeals Council directed the ALJ to develop the record further regarding Keeley's past work to determine whether he remains capable of performing any of his past work.

On August 17, 2004, after additional proceedings, a different ALJ determined that Keeley remained capable of returning to his past work despite his impairments. That decision became the final decision of the Commissioner and is now before this court on appeal.

### DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner uses a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520. Keeley challenges the ALJ's findings at steps three and four of the sequential process.

At step three, the Commissioner must determine whether the claimant has impairments that meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(d). The criteria for these listed impairments, also called Listings, are enumerated in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments). If the ALJ determines that the claimant's impairments meet or equal a Listing, the Commissioner will find the claimant disabled without completing the remaining steps in the sequence.

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545(a); Social Security Ruling (SSR) 96-8p.

At step four the Commissioner will find the claimant not disabled if the ALJ determines that he retains the RFC to perform work done in the past. 20 CFR § 404.1520(e). The ALJ in this case determined that Keeley could perform his past work and did not reach step five.

## **THE ALJ's FINDINGS**

The ALJ found that Keeley's ability to work was limited by facet sclerosis at L4-5 and L5-S1, disc space narrowing in the thoracic spine, degenerative changes in the shoulders and chronic pain in the shoulder, neck, low back and hip. He found that Keeley has a dysthymic disorder.

At step three, the ALJ determined that Keeley's conditions did not satisfy the regulatory criteria for any of the presumptively disabling conditions in the Listing of Impairments.

The ALJ assessed Keeley's RFC as follows:

> The claimant retains the residual functional capacity for light exertional activities. . . Due to side effects of the claimant's pain medications, he is precluded from the performance of work activity involving climbing of ladders, ropes, or scaffolds or involving hazards including dangerous heights and moving machinery. He also has a mild concentration deficit due to side effects of medication. He is further limited to only occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, or crawling due to his cervical and lumbar spondylosis. He is limited to occasional overhead reaching due to degenerative changes in his shoulders.

Tr. 526-27.

At step four, the ALJ relied on vocational expert testimony that Keeley's past work after the change in ownership of the bottled water company was most accurately classified as the occupation of general office clerk. The ALJ then found that the occupation of general office clerk did not require the performance of work activities precluded by Keeley's RFC. Accordingly, the ALJ concluded that Keeley could return to his past work and was not disabled within the meaning of the Social Security Act..

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence and resolving ambiguities. *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson*, 359 F.3d at 1193. The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40.

## DISCUSSION

Keeley contends the ALJ erred at step three by failing to find that his condition satisfies the regulatory criteria for Listing 12.04 *Affective Disorders*. Keeley asserts that the ALJ failed to accurately assess his RFC because he improperly evaluated Keeley's testimony, the statements of lay witnesses and the opinions of his primary care physician and an examining psychologist.

Notably, Keeley does not challenge the ALJ's findings on the issue for which the Appeals Council remanded the case, *viz.* that his past work was properly categorized as general office clerk and the work activities required by that occupation are not precluded by the limitations in the ALJ's RFC assessment.

6 - OPINION AND ORDER

I.      **Listing of Impairments**

Keeley contends the ALJ erred by failing to find him disabled at step three because his impairments satisfy the regulatory criteria for Listing 12.04 *Affective Disorders*.

The claimant has the burden of proving that he satisfies the criteria for a listed impairment based on medical evidence. *Sullivan v. Zebley,* 493 U.S. 521, 531 (1990); *Tackett v. Apfel,* 180 F.3d at 1100; 20 C.F.R. § 404.1526. The claimant's description of symptoms is insufficient. 20 C.F.R. § 404.1529(b); SSR 86-8.

Listing 12.04 refers to mental disorders characterized by prolonged disturbance of mood accompanied by a manic or depressive syndrome. The severity requirements for Listing 12.04 are set forth in paragraphs A, B and C of the Listing. The claimant can satisfy the Listing by showing both the A and B criteria or by showing the C criteria. Keeley argues that he satisfies both the A and B criteria based on the findings of David Manfield, Ph.D.

Dr. Manfield performed a comprehensive psychological evaluation of Keeley in September 2000. In his narrative report, Dr. Manfield concluded that Keeley suffered from moderate levels of depression, but was otherwise psychologically healthy. Tr. 458. He assigned a global assessment of functioning score (GAF) of 60, which is the high end of the range used by clinicians to describe moderate symptoms or moderate functional difficulties and borders the range used to describe mild symptoms. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) (DSM-IV) 30-32. Tr. 459.

The A criteria require medical evidence of a depressive syndrome characterized by at least four of nine specific symptoms. Of these, Keeley endorsed sleep disturbance and loss of concentration. Tr. 454. Dr. Manfield attributed these to Keeley's physical condition and the effects

7 - OPINION AND ORDER

of sedating pain medication. Tr. 459. Accordingly, neither were characteristics of a depressive syndrome. Dr. Manfield's report did not include the findings required for the A criteria.

The B criteria require the claimant to show that his affective disorder results in marked restrictions in two of four broad areas of function: activities of daily living; social functioning; concentration, persistence or pace; and, repeated episodes of decompensation of extended duration. In his narrative report, Dr. Manfield found marked limitation in activities of daily living, but attributed this to Keeley's physical condition and side effects of pain medication. Accordingly, it did not result from Keeley's moderate depression as required by the Listing.

In the narrative report, Dr. Manfield did not find the requisite level of limitation in the other categories of function. He found an unspecified degree of limitation in social function, but attributed this only partially to Keeley's depression. He found an unspecified level of deficiencies in concentration, persistence or pace, but attributed these to the effects and timing of Keeley's pain medications. He found that Keeley subjectively reported episodes of decompensation, but Keeley described brief episodes in which he nodded off while using the computer, experienced pain in the hips, and had difficulty tolerating a long flight. Tr. 454. The episodes he described were not in a work-like setting or of extended duration as required by the Listing criteria.

Dr. Manfield also submitted worksheets similar to the standard Social Security Psychiatric Review Technique Form (PRTF). Tr. 461-69. Keeley argues that the worksheets establish the A and B criteria for Listing 12.04. Contrary to the findings in his narrative report, Dr. Manfield indicated on the PRTF worksheets that four of the A criteria were present. Tr. 464. He indicated that Keeley had marked impairment in all four of the broad categories of function comprising the B criteria. Tr. 468.

8 - OPINION AND ORDER

The ALJ did not accept Dr. Manfield's PRTF findings. An ALJ can reject an examining physician's opinion that is inconsistent with the opinions of other physicians by making "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F3d 947, 957 (9th Cir 2002) quoting *Magallanes v. Bowen*, 881 F2d 747, 751 (9th Cir 1989); *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995). An uncontradicted opinion may be rejected for clear and convincing reasons. *Thomas*, 278 F3d at 956-57.

The ALJ's reasoning is adequate under either standard. Dr. Manfield provided the only psychological report in the record, but his opinion is based largely on his view of Keeley's physical medical condition which is contradicted by more qualified medical physicians, including Tatsuro Ogisu, M.D. who performed a comprehensive orthopedic examination.

The ALJ pointed out that Dr. Manfield's PRTF findings were dramatically inconsistent with the narrative report from his evaluation. For example, his GAF of 60, indicating moderate to mild functional difficulties cannot reasonably be reconciled with his PRTF findings of marked impairment in all categories of function. Nor is it reasonable to conclude that a person with no more than moderate depression, as Dr. Manfield found in his report, is presumptively disabled under the Listing for affective disorders, as Dr. Manfield indicated on the PRTF.

The ALJ pointed out that Dr. Manfield did not support his findings with medical evidence, relying instead on Keeley's subjective description of symptoms. For example, he found that Keeley suffered from chronic sleep disturbance, but there was no sleep study to support this. Likewise, the asserted episodes of decompensation were not supported by any evidence and were based on physical limitations that were inconsistent with the findings of the orthopedic examining physician.

9 - OPINION AND ORDER

The ALJ pointed out that Dr. Manfield found Keeley's cognitive abilities and concentration intact if sufficient time passed between taking his pain medication and testing, but less so when he took the medication immediately beforehand. The ALJ could reasonably conclude that limitations due to sedative effects could be controlled by appropriate medication scheduling. In addition, the record reflects that Keeley tapered his pain medication after seeing Dr. Manfield. The ALJ could reasonably conclude that this would lessen the effects of such medication on Keeley's psychological limitations.

The ALJ also pointed out that, despite the dramatically severe findings on the PRTF worksheets, Dr. Manfield did not recommend any mental health treatment or counseling. In his report, Dr. Manfield recommended only that Keeley begin taking antidepressant medication at a dose appropriate to treat moderate depression. Keeley was not doing so at the time Dr. Manfield performed his evaluation. The ALJ noted that Keeley later began taking antidepressants and reported improvement in his mood. The ALJ could reasonably conclude that Keeley's psychological impairment lessened after Dr. Manfield's evaluation due to appropriate medication.

The ALJ properly concluded that Dr. Manfield's findings established no more than moderate depression and failed to satisfy the criteria necessary for presumptive disability under Listing 12.04.

### II.     RFC Assessment

Keeley contends the ALJ inaccurately assessed his RFC because he improperly discredited his testimony, the statements of lay witnesses and the opinions of two physicians.

#### A.     Keeley's Testimony

Keeley testified that he worked and owned shares in a bottled water company until it was sold in June 1997. Tr. 874. Early in his employment, he worked as a delivery driver and later was in

charge of distribution and dispatching deliveries to new accounts. From 1990 until the company was sold in June 1997, Keeley worked in the office managing distribution and performing work of a general clerical nature, including accounting, paying bills and general office work. Tr. 875-80, 1085-86.

In June 1997, the company was sold and a holding company was formed to wrap up the final affairs of the former company. Keeley worked part-time from his home for the holding company until December 1999 when there was nothing left for him to do and his job ended. Tr. 874, 1087. Keeley maintained some of the corporate records of the former company, responded to requests for information contained in those records, maintained a bank account for settling small bills and processed claims against the former company by routing them to the appropriate attorney or accountant. Tr. 1087-93.

Early on, Keeley worked two to three days per week for the holding company. Toward the end, the work dwindled to a few hours per week. Tr. 1095. On average, he worked about six to eight hours a day approximately two days a week. Tr. 875-80. For this he was paid a monthly salary of about $2500. Tr. 1095.

Keeley testified that he could not return to his former work because of fatigue, migraines, stiff joints after sitting or standing too long, inability to lift over 20 pounds and side effects from pain medications, including drowsiness and difficulty concentrating. Tr. 881, 895-96.

Keeley testified that on good days, he could stand for 30 to 60 minutes at a time without taking a break and walk seven to ten blocks before needing a brief rest. He could stand or walk for a total of about four hours a day. He could sit for 20 to 30 minutes before needing to stand and stretch. Keeley estimated that he had about 12 to 15 good days per month. Tr. 899-901.

11 - OPINION AND ORDER

Keeley testified that on bad days, he could walk no more than four blocks and sit for about 20 minutes at a time. He elevates his feet to relieve cramps in his calves about once per day for about one hour in the evening while watching television. Low back pain prevents reaching below his knees. His hands shake uncontrollably and he drops things. He has incapacitating pain about 20 percent of the time. Tr. 901-04.

Keeley testified that his pain and stiffness are dependent on his level of physical activity. Either too much or not enough physical exercise worsens his condition. Tr. 901. He does physical therapy three times a week and works out at a gym for about an hour three times a week. He takes walks around the area where he lives. Tr. 883. His daily activities include cooking, vacuuming, ironing, paying bills on-line, mowing the lawn with a riding mower, light gardening and weekly dinners with his daughter and her family. Tr. 890-92. He can operate a vacuum cleaner for up to 30 minutes at a time. Tr. 903.

Keeley takes methadone daily, as needed for pain. Tr. 888-89. This causes drowsiness. He also has constipation, which is controlled if he eats the right foods. Tr. 893. He takes Trazadone for help sleeping, which leaves him drowsy upon awakening. He takes blood pressure medication which causes dry mouth and frequent urination. Tr. 885-86. He takes an antidepressant which apparently has no adverse side effects and improves his mood. He also takes a migraine medication about four times a year. He took morphine until some time in 2000. Tr. 888, 894.

The ALJ found credible Keeley's assertions that he experiences pain, fatigue and medication side effects, including drowsiness and deficiencies in concentration. He included vocational limitations reflecting these impairments in his RFC assessment. The ALJ rejected only Keeley's assertion that these limitations leave him incapable of performing his past work.

12 - OPINION AND ORDER

The ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding the severity of his symptoms. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). *See also Smolen v. Chater*, 80 F.3d 1273, 1283 (9th Cir. 1996). The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

The ALJ may consider objective medical evidence and the claimant's treatment history as well as the claimant's unexplained failure to seek treatment or to follow a prescribed course of treatment. *Smolen*, 80 F.3d at 1284. The ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Id*. In addition, the ALJ may employ ordinary techniques of credibility evaluation such as prior inconsistent statements concerning symptoms and statements by the claimant that appear to be less than candid. *Id*. 20 C.F.R. § 404.1529; SSR 96-7p.

The ALJ found the severity of pain Keeley asserted disproportionate to the minimal objective medical findings. Diagnostic imaging showed modest hardening of the facets at L4-5 and L5-S1 and scattered scattered degenerative changes in the thoracic spine. He had otherwise normal structure of the spine without signs of spinal or nerve root compression or erosive or destructive lesions. Tr. 415, 814. In March 2000, diagnostic imaging showed slight degenerative changes in the acromioclavicular joints and small area of rotator cuff calcification on one side. Tr. 816, 722.

All other laboratory studies and diagnostic imaging were essentially normal. A CT scan of Keeley's brain was completely negative in 1994, when he sought emergency services for a severe headache. Tr. 371. After being hit in the eye with a ball in September 1999, a CT scan showed temporary soft-tissue swelling in the left orbital region of his face, with no bone fracture, hemorrhage

13 - OPINION AND ORDER

or injury to the musculature. Tr. 413. A CT scan of Keeley's sinuses showed mild mucosal thickening in November 1999. Tr. 412. A flexible sigmoidoscopy performed in November 2000 was unremarkable. Tr. 815. In November 2002, a CT scan of the abdomen and pelvis showed only a few benign abnormalities in Keeley's internal organs. Tr. 811-13. A urology work-up revealed a benign enlarged prostate for which treatment was available with medication and microwave thermotherapy. Tr. 671, 1070.

Similarly, physical examinations produced minimal clinical findings. In August 1998, a physical examination by Kip Kemple, M.D., was normal except for degenerative pattern range of motion restrictions in the low back and neck. Tr. 393. In March 2000, Dr. Kemple found moderate restriction in Keeley's cervical range of motion without radicular findings. Keeley also had some restriction of shoulder motion. Tr. 725.

In March 2003, Dr. Ogisu performed a comprehensive orthopedic examination and concluded as follows:

> The patient should be able to sit for 6 hours out of an 8-hour day provided he is able to alternate between sitting and standing. He should be able to stand and walk for 6 hours out of an 8-hour day again allowing for postural breaks. He should be able to lift and carry up to 20 pounds on an occasional basis. There is no restriction on gross or fine manipulation. He is able to hear and speak without difficulty. Based on his diagnoses, his performance is likely to vary from day to day.

Tr. 669.

Similarly, Keeley's treatment history did not support his assertions of incapacitating pain. Keeley began treatment with Dr. Kemple in 1994 for chronic musculoskeletal pain. Tr. 696. In November 1994, physical therapy and a home stretching and exercise program resulted in improved

flexibility and range of motion, but Keeley reported no improvement in his pain. Tr. 418-19. In regular follow-up visits, Keeley generally reported that his narcotic pain medications were working and that he had a generally stable level of pain when on medication. Tr. 394, 402-09, 470-81, 681-82, 693, 1061. None of Dr. Kemple's contemporaneous records reflect complaints from Keeley of incapacitating pain such as described in his testimony.

The ALJ could reasonably conclude from this treatment history that Keeley's condition has remained generally stable or improved somewhat since Dr. Kemple began treating him in 1994. Keeley continued to work for five years after that time. When he stopped working, it was not due to his medical condition, but because his job was discontinued when there was nothing left for him to do. Tr. 874, 1087.

As described previously, Keeley's mental health treatment history does not support any debilitating psychological symptoms. Based on Dr. Manfield's recommendation, Dr. Kemple prescribed an antidepressant medication, which Keeley asserts has improved his mood. Tr. 884, 888. There is no record that Keeley sought or received any other mental health care.

The ALJ also believed that Keeley's daily activities were consistent with the ability to perform his past work. Keeley reported that an average day included two hours of light housekeeping and small jobs around the house, up to two hours of exercise therapy and a walk in the evening. Tr. 143. He also engaged in small woodworking projects and light gardening for two hours at a time three times a week each. Tr. 147. He testified that his daily activities include cooking, vacuuming, ironing, paying bills on-line, mowing the lawn with a riding mower and light gardening. Tr. 890-92. He frequently has dinner with his daughter and her family and he plays with his grandson. Tr. 353, 891. The ALJ could reasonably conclude that Keeley's activities, interspersed

with periods of resting, are not inconsistent with work at a light exertional level with the accommodations described in his RFC assessment and rest during the breaks and lunch periods available in a normal workday.

The ALJ considered proper factors and his credibility determination is supported by substantial evidence in the record as a whole, including the objective and clinical medical evidence, Keeley's treatment history, his work history and his reported daily activities. The ALJ's interpretation of that evidence is reasonable and provides an adequate basis for discounting Keeley's assertion that his symptoms are so severe that he cannot perform his past work.

### B.     Lay Witness Statements

Friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill v. Shalala,* 12 F3d 915, 918 (9th Cir 1993). Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*

Keeley's wife testified that Keeley can walk about five blocks without stopping to rest. He has limited reaching ability in the right arm and his hands become swollen and stiff. He seems to be bothered by pain about 90 percent of the time. After 30 minutes of light gardening or vacuuming, he must sit for 20 minutes. Mrs. Keeley estimated that he does things at about 25 percent of the pace of a normal person. She testified that Keeley has difficulty remembering, becomes confused, has less concentration and cannot "complete the thinking process" to pay the bills. Tr. 909. He also has daily constipation and spends a long time in the bathroom. She said that Keeley has headaches at least once a month. The testimony of Keeley's daughter was consistent with that of Mrs. Keeley.

The ALJ accepted the accuracy of the observations of Keeley's wife and daughter. He found that they were credible to the same extent that Keeley himself was credible. His RFC assessment included limitations for concentration deficits, difficulty reaching and inability to exceed light exertion due to pain and fatigue.

He did not include limitations to accommodate a reduced pace or cognitive deficits or accept that Keeley's limitations caused functional limitations severe enough to preclude light work, including Keeley's past work. The ALJ rejected those parts of the lay testimony for the same reasons that he discredited Keeley's subjective statements, and because some of their statements were not consistent with Keeley's own testimony. Tr. 523-24.

As with Keeley's subjective statements, the lay statements were inconsistent with the objective and clinical medical evidence and Keeley's treatment history, work history and reported daily activities. For example, contrary to the lay witness testimony Drs. Keeley and Ogisu found no limitation in fine or gross manipulation. There are no contemporaneous reports to medical providers describing reduced pace. Dr. Manfield found only medication-related lapses in concentration that could be controlled by medication scheduling. Contrary to the lay testimony, Keeley testified that he has only four or five migraines per year and that his constipation is controlled if he eats properly. Based on the foregoing, the court is satisfied that the ALJ did not reject the lay witnesses without proper consideration.

    **C.**    **Physicians' Opinions**

Keeley contends the ALJ improperly rejected the opinions of Drs. Kemple and Manfield. Dr. Kemple treated Keeley beginning in 1994 and Dr. Manfield performed the comprehensive psychological examination described above.

17 - OPINION AND ORDER

Keeley asserts that the ALJ rejected Dr. Manfield's opinion that he has marked limitations in activities of daily living and social functioning solely because Dr. Manfield's opinion was obtained by Keeley's counsel in support of his present claim. This argument is not supported by the record. As described previously, the ALJ rejected Dr. Manfield's findings of marked functional limitations for clear and convincing reasons.

Dr. Manfield's worksheet findings of marked functional limitations were dramatically inconsistent with his comprehensive report which indicated borderline moderate to mild functional limitations. Dr. Manfield expressly based his findings of marked limitation largely on his view of Keeley's medical condition. The ALJ properly noted that Dr. Manfield is a psychologist without medical training.

The ALJ also noted that Dr. Manfield's understanding of Keeley's medical condition was based on Keeley's subjective reports. An ALJ can properly reject a physician's disability opinion that is premised on the claimant's own subjective complaint of disabling symptoms which the ALJ has properly discounted. *Fair v. Bowen*, 885 F2d 597, 605 (9th Cir 1989); *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001). These reasons provide a sufficient basis for the ALJ to reject Dr. Manfield's findings regardless of whether the ALJ's other reason was proper or sufficient.

On September 14, 2001, Dr. Kemple prepared a questionnaire provided by Keeley's counsel regarding his functional limitations. Dr. Kemple had been providing Keeley's general medical care and pain management in regular visits since 1994. He indicated that Keeley met the diagnostic criteria for fibromyalgia, chronic fatigue syndrome, hypertension, migraine and degeneration in the lumbar and cervical spine. Tr. 496. In response to one question, Dr. Kemple indicated that it was

likely Keeley would be absent from work more than four times each month due to his impairments or treatment. Tr. 502.

The ALJ properly noted that Dr. Kemple's opinion was deficient in the following respects. Neither the questionnaire nor Dr. Kemple's chart notes included findings demonstrating that Keeley is incapacitated from work activities more than four times a month. When asked to identify the clinical findings and laboratory test results that showed Keeley's medical impairments, Dr. Kemple identified only x-rays of the left shoulder, neck and low back. Tr. 497. Those x-rays, described previously, do not suggest any medical condition that would preclude Keeley's past work or require him to be absent frequently.

When asked to identify all of Keeley's symptoms, Dr. Kemple indicated several that were inconsistent with the record or supported only by Keeley's subjective statements. For example, pointed out the lack of recorded medical findings supporting Dr. Kemple's diagnoses of fibromyalgia and chronic fatigue syndrome. Tr. 520-21.

Dr. Kemple did not make any findings regarding exertional limitations. He candidly indicated that he did not know whether Keeley was limited in how far he could walk, how long he could sit or stand or whether he needed the option to alternate sitting and standing. He did not know Keeley's lifting ability and was not sure how often he would need to take unscheduled breaks. Tr. 499-501.

Dr. Kemple did not offer any rationale for his opinion that Keeley would be likely to miss work more than four times a month. The ALJ need not accept a treating physician's bare conclusion that is not supported by objective or clinical medical findings. *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992); *Tonapetyan,* 242 F.3d at 1149. Here the ALJ reasonably concluded that Dr.

Ogisu's examination and report more accurately reflected Keeley's functional limitations than the unsupported conclusions of Dr. Kemple.

Based on the foregoing, the ALJ's evaluation of the medical opinions was free of legal error and supported by a rational interpretation of substantial evidence in the record as a whole. His conclusions must be upheld. *Batson,* 359 F.3d at 1193.

In summary, Keeley's challenges to the ALJ's RFC assessment cannot be sustained. The ALJ's conclusion that Keeley retains the RFC to perform general clerical work is free of legal error and supported by substantial evidence in the record as a whole. Accordingly, his conclusion that Keeley can return to his past work must be upheld.

## CONCLUSION

Based on the foregoing, the Commissioner's final decision that Keeley does not suffer from a disability and is not entitled to benefits under the Social Security Act is AFFIRMED and the case is DISMISSED.

DATED this __13__ day of June, 2006.

/s/ Ann Aiken
Ann Aiken
United States District Judge